We will hear argument next in number 151750, McDermid Printing Solutions against E.I. DuPont Mr. Horvath? Yes, Your Honor. Good morning. May it please the Court, my name is John Horvath. I'm here for McDermid. This is an appeal from the Patent Board. The Board confirmed as patentable Claims 2 to 6 in 15 and 16 of the 454 patent. We've raised four issues on appeal. Importantly, the reason the Board confirmed the patentability was the inclusion of a forced cooling means in Claim 2 and forcibly cooling by a cooling means in Claim 15. We all agree that this is means plus function claiming that the corresponding structure is one of three things, two important to this appeal. One, a simple blower or fan, which is item 356 in Figure 15. The alternative is a drum with internal circulating air, which is depicted in Figure 19 of the patent. Importantly, the Board determined that a fan was not obvious in this device, which was known to overheat thermal plates, because it would also cool the composition layer. It also held that switching from a heated drum to a cooled drum would not predictably allow thermal development. What's important about that is the claim construction issue which we've raised. Specifically, the claims allow a very wide range of allowable cooling temperatures. That necessarily informs whether or not there was a reasonable expectation of success in adding these cooling elements. Wrongfully, we contend, the Board used the prior art to restrict the broad claim language. Can you explain this to me? I don't know quite what to make of the sentence in their reconsideration decision that refers in the broadest reasonable interpretation sentence to prior art. Can you explain to me why what the Board said there is somehow central to its substantive analysis? I thought that if you ask, does the prior art show either of the two structures that stand behind this means plus function claim, that it didn't find that the prior art would have made any of those obvious, essentially because in the flexographic world, there was no reason to think that when you had to heat both sides, you would start cooling. Can you explain what role that somewhat odd BRI sentence plays in the analysis? I thought it was critical and not odd. I think the role was on rehearing that it was raised at Appendix 38. We said in our rehearing petition that your conclusion about a reasonable expectation of its success not being found was wrong because you didn't appreciate the full scope of the cooling temperatures which were allowable by the claim language. And they came back and said, well, we have considered it, and they made an explicit holding that according to them, the broadest reasonable interpretation excludes temperatures taught by the claim language. The claim language is not specific as to temperatures. It's broad. It says cooling simply in Claim 2, and there's a generic temperature TC in Claim 15. That is different fundamentally from other claim language in other claims. Specifically in Claim 1, it talks about a temperature differential between heating the specifically at least 20F. Claim 17 has a comparable specific limitation, and Claim 18 goes on and talks about heating the composition layer to a specific temperature, well, excuse me, a temperature range between 40 and 200. That tells us that the broad claim language in 2 and 15 is unrestricted. If the inventor intended to restrict it, they knew how to do so. They did so in other claims. Most importantly, the broadest reasonable construction cannot be detached from the specification. The specification is specific, specifically at Column 24, Lines 40 to 43, Appendix A161, where they're describing the cooling means, which is the subject of dispute, and they describe specifically that Element 16 is cooled by removal of heat from the wall portion of the outer surface with the flexible substrate being cooled to a temperature lower than the composition layer. All that's required is that the cooling temperature be lower than the heating temperature or the thermal development temperature. That is confirmed also in the summary of invention at Column 3, Lines 55 to 58. I'll note further that the patent does not describe any artificial means to cool the temperature. It's simply blowing air that's in the environment. This is a machine that has heating elements, as your honors know. It needs to heat the plate. It has an IR preheater, and it's simply blowing air around. It's not artificially cooling. For those reasons, the board was wrong in their judgment about the broadest reasonable interpretation, and that, again, critically informed their view about reasonable expectation of success. Specifically, the Martin's reference teaches us that 60 degrees C as a cooling temperature works just fine. It doesn't cause distortion. It allows appropriate thermal development. Example 2 is very explicit at A115 in that regard. In that example, they have successful development occurring with a cooling temperature of about 60 degrees C, which is less than the thermal development temperature, which is 175. The board's conclusion about a lack of reasonable expectation of success was faulty because the claim construction was wrong. Secondly, the board erred in our judgment in concluding that a simple fan blower, 356, being pointed at a photosensitive element which was known to get too hot and distort was not an obvious solution to the problem. The ultimate question of obviousness is de novo for you. There are no disputes material that are underlying that conclusion. Specifically, Martin's and Behita teach the thermal apparatus and the thermal process, which is claimed. The board itself concluded that it is common sense to cool something that is too hot at A35. It is well known that blowing air with a fan cools. That's not new at A36. The only difference between Martin's and Behita in the claimed invention is this blower directing air at the photosensitive element. The level of skill was not in dispute. At A42, the board... Let me just ask a question that you'll have to translate into the specifics. My general takeaway from the several board opinions was something like this. In this particular set of processes, what the prior art said was the flexographic processes, put aside the photo image processes for now, said everything's supposed to be hot, in particular, the surface that you want to cool. We don't see the evidence why it would have been obvious to start cooling, in particular, the outside with a fan. That part you want to stay hot. Address that for me. The photosensitive element was known to get too hot and distort. First, Peterson... The photosensitive element is the substrate or... The entire thing. The entire thing. Yes. The substrate with the composition layer on top. Explicitly, in Martin's, it teaches that fact. It was not hindsight to believe that the entire thing could distort. Specifically, at A73, column three, lines 11 to 17, Peterson expressly warned that thermal temperatures in this machine and in this process should not distort the flexible substrate or the hardened composition layer. The board failed to appreciate that the art taught that both the substrate and the composition layer could be distorted. Therefore, it is obvious and common sense to blow air at both layers, with it being as much so at the top as it is the bottom. Plus, basic conduction principles would say, if you truly are just worried about the substrate, you could blow air at the top only, and through conduction, the heat would move from the substrate to the composition layer. If there is not a worry about distorting both, there's still a good common sense reason to blow air at the top. The prior art systems all use and rely exclusively on heating, correct? Correct. So if there's a concern about the heating causing distortion, wouldn't the most obvious reaction to that be just, well, turn down the heat a little bit? You could do that, absolutely. But wouldn't that be the normal reaction? And isn't there some force to the argument that it's counterintuitive in a system that relies on heating, not to adjust the heating, but to the same time? Right. So Peterson teaches us that with multiple cycles, the element builds up heat. And so cycle two, it's hotter overall than cycle one, three, the same. And so it is common sense after the application of that intense heat to cool it so that it gets back to its more stable initial state and goes back through the thermal process so that the heat buildup is not too much. Furthermore, I believe the answer to your question lies in Leavitt. The photographic arts had the same problem. They heated both sides. The PET substrate on it was on a hot drum. It built up too much heat. It distorted. The solution was a simple one. Let's cool the drum with air-filled drum and allow us to put more heat at the top. Where we need it. In that art, just like this art, the heat needed to be at the composition layer, not the substrate. And so the solution is found in Leavitt. That's why you would, you could, I don't disagree that you could do as your honor suggests, turn down the heat, but you could also look to the solution of Leavitt. And Leavitt, was the drum heated at all? Oh, yes. Yes, your honor. Yes, absolutely. That was the state of, that was the state and the progression of that art. They had a heated drum. It caused the same PET substrate problem. And they found the solution of cooling the drum while applying aggressive heat at the top. The same progression happened here. And one only needed to look to Leavitt for that particular solution. The other element of legal error from our perspective is that the board absolutely required a reasonable expectation of success. Proof that's at A23 and reaffirmed at A39. Respectfully, that is not the law. The law does not mandate it. Your law says it's a helpful hint. It's a good insight. But when you turn absolute, when you turn insights that are helpful into absolute rules, that distorts the analysis. Here, it was obvious to take Leavitt's drum, for example, and apply it to a known problem of distorting the substrate. KSR allows that at 417. Your wires decision, I believe, says the exact same thing. When all claim elements are known and the invention is stressed to a known problem, KSR compels a conclusion of obviousness. I'll note further that in the photographic arts, the heat needed to thermally develop those compositions was much higher. The minimum was much higher. Specifically, it was at 99 to 166 C. That was the range, a higher narrow range. In the flexographic art, Peterson teaches us at A73 that that range is 40 to 200 C. And so there should be, and there would be, no concern for overcooling the flexographic element, because all you needed to do is get it to 40 C, whereas in the photographic arts, you needed to get it to 99 C, and the solution worked perfectly there. Air-cooled drum protected the PET substrate from distortion, allowed directly heating it so that development, according to Leavitt at A49, would readily occur. The last element of error, in our view, is the obvious to try analysis. As your honors know, the board initially found that the record, that the board determined that the record showed a great variety of ways to address thermal distortion. That's at A28. On rehearing when we challenged that, they reversed and changed their view. They concluded at A43, the record before us only describes three solutions. The three solutions being annealing, controlled heating, or cooling. But they didn't allow the analysis of obvious to try, because they said that we did not prove that there were no other solutions in the world outside the record. And therefore, the obvious to try analysis failed. And they said the burden was appropriate under the post-KSR line of cases. Respectfully, that is wrong, and that was at A43. There is no such requirement. Requirements are twofold. Is there a design need? Right. You've used not only your opening time, but your rebuttal time. I'll restore two minutes, but I think you should take them. I will. I apologize. Thank you, your honors. Tulipsy. May it please the court. A couple of corrections just to get started. There is no standard temperature at which these things are heated and at which they're cooled. It's all a function of the chemistry of the photopolymer or of the photographic layer. And so you cannot take a statement that some polymers can be developed at 40 degrees C and say that all polymers can be developed at 40 degrees C. You cannot say that the temperatures in Martins are appropriate for some other polymer, that the temperatures in Martins were appropriate for that polymer. And while we're on Martins, Martins doesn't say anything about the stability of the substrate layer, other than that he prefers to use the betasia treated film. The temperatures that he uses there are not described as cooling. They are described both as heated elements. And there's simply no discussion at all about whether that results in elimination of warping of the film because, in fact, he doesn't measure any kind of distortion of the film there. The person who measures it is betasia. And betasia, when he uses a similar polymer under similar conditions, heated to 60 degrees or 65 on one side and a much higher temperature on the other, he showed that without the treatment of his film, you did get unacceptable distortion even at those temperatures. Now, the fact of the matter is the essence of the argument below was that there was an expedient shown in the photographic film art for cooling the bottom of the surface, and it would have been obvious to use that in the flexographic printing plate. And we submit there are three fundamental differences between those technologies that answer a number of questions. The first of which is why the printing art always heated drums and heated rollers to heat both sides of the film. It answers the question of why Leavitt's film approach was fundamentally incompatible with the printing plate development needs. And it also answers the question and demonstrates that the board's finding that success in combining the two could not reasonably have been predicted and that that's supported by substantial evidence. And those three differences are the photosensitive emulsions are quite thin. There's a Udelson patent that's stated at page 13 of their opening. Which are quite thin, you said? Thin. The emulsions are quite thin. They cite Udelson at page 13 of their opening brief. And if you look at example 14 there, you can see that emulsion layer is three mils thick, three thousandths of an inch thick. That's about the thickness of a human hair. Whereas in the photopolymer printing art, those films are quite thick. If you look at Patasia, A89, he says it can be up to three millimeters thick, which is in the Leavitt work. Secondly, Leavitt specifically says twice, once in column three and once in column four, that his objective is to develop just the very top surface of that emulsion because that's where the image is clearest. And specifically not to develop the layer further down into it. And the exact opposite is true with the photopolymer plate art. You need to develop the photopolymer plate art to a substantial distance down into the relief structures that are required. And indeed, if you look at Martin's, you can see that some of those reliefs are as deep as 36 mils, 36 thousandths of an inch. And finally, the development process in chemistry is entirely different in that the photographic plate is developed entirely by a chemical reaction stimulated by heat. Whereas the photopolymer, the development requires getting the polymer layer hot, keeping it hot, keeping it hot through a substantial portion of its thickness and passing it through repeated cycles of heat and pressure between two solid layers in order to blot away a very substantial amount of its thickness. And what that leads to is that Leavitt's emulsion substrate could float on a layer of cooled gas. And that's what Leavitt discloses in all embodiments, including the drum. The drum is not the operative embodiment for Leavitt is one where the drum actually is cooled and air is coming, the drum isn't cooled, but cool air is coming out of it and the substrate layer of the photographic film is floating on top of it. That could happen because the top surface of the emulsion could be developed by heat alone applied only to the top surface. Where in contrast with the printing plate, it was uniformly taught that heating on both sides was required to get it hot and keep it hot so that it could go through those multiple processes of high pressure between those rolls. And the bottom line is that heating on both sides of the plate and then compressing repeatedly while hot between solid surfaces were viewed as necessary evils in the photopolymer art. DuPont says at page eight of its brief that flexographic printing has been known since 1959. The Leavitt publication came out in 1974, but it wasn't until 25 years later that anybody suggested using forced cooling in connection with the development of a photopolymer plate. Instead, everybody was using two heated rollers. But the problem of substrate warping or distortion was recognized, right? In the flexographic art. Absolutely recognized and the art was repeated. And it was a problem that derived from it being too hot. Too hot at the surface that was next to something that had to be hot. That's exactly the problem. It's not so obvious how you're supposed to deal with that. And that's really what the board found. And basically, the printing art, because of that, looked elsewhere. You can see in the Peterson publication. One thing he suggests is using photopolymers that have a low melting point. He talks about using substrates that have a high melting point. But what's the intuition behind saying that it's not obvious that if something is too hot, cool it down? Because it being hot was essential to the development operation. It had to be hot and stay hot. And they were so thick, you couldn't just heat them from one side. You had to heat them from both sides. And so the question became that that is a necessary evil and we deal with it other ways. We treat the film in order to enhance the stability. And that was what Patasia taught. And Martin said, yeah, I use Patasia. So basically, the essence of the board's opinion was rooted in recognizing. Let me ask the question this way. Since at least Peterson, it's recognized that there can be warping if the substrate is too hot. And are you saying that there was no suggestion? I mean, that in the loosest, most general possible way, that one thing you might do in the flexographic art is to make it less hot. There was always live with it and get stuff that withstands the heat better. Was there any suggestion make it less hot? The record before us is that it was the latter, live with it and get stuff that doesn't warp. The argument is made that, oh, Martins was teaching using those two different temperatures in order to cool the layer and to enhance stability. Martins doesn't say a word about that. All of these references use two different temperatures, one at the bottom to try to get the layer up close to its melting point and a hotter one at the top in order to melt what's right there at the surface and obviously being easier to melt what's at the surface when the whole layer below it is close. That's the objective. That was a necessary evil. While there were cooling means described for other types of operations, for 25 years before this invention, there is nothing cited in this record that says, oh, let's just cool it even though we know it needs to be hot. The board found as fact that there was insufficient evidence that switching from a heated drum to a cooled drum would have predictably allowed overall development of the plate. They found as a fact that the level of skill was not so high that a person of ordinary skill in the art would have resolved these competing considerations of the heating and cooling in these disparate art areas. They found as a fact that only hindsight knowledge of the 454 patent convention suggested the modifications and those findings are supported by substantial evidence. Can you address what I described as the somewhat odd sentence, which I take it from your brief, you also find somewhat odd? It is not a model. It's not a model of clarity. I kept thinking there must be a way to put some words in there that must have been implicitly in there to make sense, but I don't see it. I think the key, if you go back, the one thing that's abundantly clear is that the opinion didn't change on rehearing. They said we didn't impose a temperature limitation originally and we are not changing anything in the opinion. That's the conclusion at the end of rehearing. Nothing changed. And when you look back at the original decision, you see it was an absolutely classic means plus function analysis. It's a means plus function limitation. I look at the spec to see what the disclosed means are. There were three. There was the blowing the air onto the polymer surface of the printing plate, which was absolutely counterintuitive. That was the one thing that you wanted to stay hot. There was the cooling of the liquid under the surface of the drum and there was blowing of the air into the cavity inside the drum. They said those are the three means and the claim covers those and their equivalents. The claim does not cover a temperature differential between two heated drums because the specification itself described that as embodiment A and distinguished the forced cooling in embodiment B. So that was fine. Then you look at what happened on rehearing and McDermott conflated two arguments. They conflated the claim construction issue with an obviousness argument, which was that well, the prior art tells you that success is guaranteed at 60 degrees. Never mind what the polymers are. Never mind what the actual temperatures ought to be. Success is guaranteed at 60. And the board dealt with that in the same paragraph and said that's not true in an obviousness sense because you can look at Batesia that I've been mispronouncing regularly and I apologize. You can look at Batesia and see in his example where he took an untreated film and developed it at 60 degrees C, the amount of distortion was unacceptably high. It was over his limit of 0.03%. So you can't say just ipsy-dixit that success is guaranteed at that temperature. And that was right in the same paragraph. So then they came back and said we're not changing anything. The claim that the applicant said he's not including temperature differential between these two layers, just as they said before. So it covers, and they came up with a language that kind of synthesized the three objects, forcing a coolant material into the area around the drum that was more or less a synthesis of the three that were disclosed. Right, but then it ends with some reference to quite specific temperatures. And then it says, if I have it correctly. Without heating the drum. Without heating the drum. Now if you stop there, that's exactly what they held before. In other words, the embodiment where the drum was heated and the roller was heated and there was a difference in temperature is not covered by the claims. It was distinguished within the patent specification itself from forced cooling. And I think that's probably the way to read that because it at least comports with the prior decision, which was it covered these three things, but not two different heated drums. And the other alternative is that as McDermott had completed the 103 argument with the claim construction, the board fell into that as well. But I think the one thing that is abundantly clear from the end of the rehearing petition is that the original claim construction was not changed in re-hearing. So are there any questions? I'm happy to answer them. Otherwise, thank you very much. Thank you, Mr. Lipschitz. I'll try to be as brief as possible. The broadest reasonable construction that you're troubled with, I think, is a function of us coming to them after the original hearing and saying, you didn't consider the full scope of temperatures of cooling as allowed by the claim, and that's why your reasonable expectation of success finding was wrong. They came back and said, no, we're not wrong because we're cabining the temperatures to something less than what was taught by the prior art. It's a fundamental flaw, an error of law. Mr. Lipschitz cannot even defend it. We know that you can't construe a claim with the prior art. You can't ignore the claim language in its breadth, particularly in the broadest reasonable construction, and the spec is very clear. All that's required is the cooling temperature needs to be less than the thermal development temperature. Secondly, and in conclusion, the arguments trying to distinguish leave it full because of your recent Belden decision. The Belden decision says quite clearly that when you have distinctions that don't matter to the- Well, you gave three reasons why maybe those distinctions do matter. Can you address the thinness of the film and the depth to which you want to change things, and I guess the cyclic versus constant heat properties of- Yes, so there are differences in thinness that's undisputed, but that doesn't matter to the problem of PET distortion. It's the same substrate attached to both films, and that is what was taught by Behita and Martens to be distorting. Whether it's a thick composition layer or a thin composition layer, it's the same film distorting under comparable temperatures, and so leave it solution would still apply. It doesn't matter what's on top, and I believe the Belden decision says that. Furthermore, it is true that the relief needs to be, for example, 23 mils or 36 mils to get down to create the relief, but multiple passes occur. For example, 10 passes can occur in Martens, and therefore, if you do the division, about 3.6 mils of material needs to be removed, about the same composition as the photographic And so only the top layer of the flexographic film, just like the top layer of the photographic films, needs to be heated sufficient to melt it sufficiently so the blotter with pressure can remove about 3.6 mils, and so there's no difference functionally between photographic arts and flexographic arts in that context. Unless you have something to say finally, our time is running out. The repeated cycles difference, that helps flexographic arts. You could run it through multiple cycles, and so cooling can be overcome or compensated by multiple cycles. There's no limit to the cycles. Thank you very much. Thank you very much. The case is submitted, and the court will stand in recess. All rise. The Honorable Court is adjourned from day to day.